Peter FELDMAN, Plaintiff,

v.

Rory J. CUTAIA, Steven J. Kumble, Jonathan Lawrence, James T. Raymond, Llewellen Werner, William Hitchcock, Leonard V. Sessa, the Cutaia Group, LLC, Keith J. Keenan, J. Todd Raymond, GI Partners Fund II, L.P., GI Partners Side Fund II, L.P., Defendants,

and

The Telx Group, Inc., a Delaware Corporation, Nominal Defendant.

C.A. No. 1656–VCL.

Court of Chancery of Delaware, New Castle County.

Submitted: May 15, 2007.
Decided: Aug. 1, 2007.

Matthew E. Fischer, Esquire, Timothy R. Dudderar, Esquire, Berton W. Ashman, Jr., Esquire, Potter Anderson & Corroon, LLP, Wilmington, DE, for Peter Feldman.

Vernon R. Proctor, Esquire, Proctor Heyman, LLP, Wilmington, DE, for Steven J. Kumble, James T. Raymond, Llewellyn Werner, William Hitchcock, Leonard V. Sessa, and Keith J. Kennan.

Stephen E. Jenkins, Esquire, Richard L. Renck, Esquire, Andrew D. Cordo, Esquire, Ashby & Geddes, Wilmington, DE, for Rory Cutaia, J. Todd Raymond, Jonathan Lawrence, and the Cutaia Group, LLC.

Lewis H. Lazarus, Esquire, Thomas E. Hanson, Jr., Esquire, Morris James, LLP, Wilmington, DE, for The Telx Group, Inc.

Srinivas M. Raju, Esquire, Brock E. Czeschin, Esquire, Richards, Layton & Finger, P.A., Wilmington, DE; Luke J. Bergstrom, Esquire, Latham & Watkins, Menlo Park, CA, for GI Partners Fund II, L.P. and GI Partners Side Fund II, L.P.

*OPINION*

LAMB, Vice Chancellor.

A co-founder and now former stockholder of a Delaware corporation sues members of the company's management and its directors for alleged breaches of fiduciary duty arising out of a number of transactions, including a recapitalization scheme, a stock repurchase, an issuance of stock options, and ultimately a cash-out merger. The various defendants move to dismiss the complaint, arguing that the merger extinguished the plaintiff's standing to bring derivative causes of action in the right of the corporation. Because the complaint does not adequately allege the presence of a controlling stockholder (which might allow the plaintiff to bring a direct claim for unfair equity dilution), and since no equitable exception to the continuous stock ownership requirement operates here (which would allow the plaintiff to continue asserting its derivative claims), the defendants' motions will be granted.

**I.**

**A. *The Parties***

The plaintiff, Peter Feldman, was a co-founder of The Telx Group, Inc., a privately-held Delaware corporation with a principal place of business in New York. At all relevant times before an October 2006 merger, Feldman was a record and beneficial owner of the company's common stock.

On October 3, 2006, the defendants GI Partners Fund II, L.P. and GI Partners Side Fund II, L.P. (collectively, "GI Partners") acquired all the outstanding stock of Telx through an all-cash merger. Before that merger occurred, the defendants Rory J. Cutaia, Jonathan Lawrence, James T. Raymond ("J. Raymond"), Llewellen Werner, William Hitchcock, Leonard V. Sessa, and Steven J. Kumble sat on the Telx

board of directors. Cutaia served as the company's chief executive officer, president, and chairman of the board, while Lawrence acted as chief financial officer and chief operating officer. Defendant Keith J. Keenan served as a Telx director until his resignation from the board in February 2005. Telx's former general counsel and controller, J. Todd Raymond ("T. Raymond"), is also a defendant in this lawsuit. These individuals are hereinafter referred to as the "Telx Defendants."[1]

## B. *The Facts*[2]

In August 2000, Cutaia, Feldman, and other investors formed Telx to provide interconnection facilities and services for telecommunications and internet service providers. Thereafter, Feldman served as the company's chief technology officer and as a director until he resigned in July 2002. In June and August 2004, Feldman sold the vast majority of his interest in Telx, approximately 148,000 shares of common stock, to Kumble in an arms'—length transaction at $3.36 per share. Feldman retained roughly 1,000 Telx shares following this sale, and, on August 6, 2004, filed an action to inspect the company's books and records pursuant to 8 *Del. C.* § 220. The parties settled that case in May 2005. Relying on the information he obtained in the section 220 action, Feldman filed this lawsuit in September 2005. The complaint now before the court is most efficiently

analyzed by reviewing each of the four classes of transactions giving rise to Feldman's fourteen causes of action.

### 1. *The Dilutive Transactions*

The Telx Defendants' alleged scheme of self-enrichment began in March 2002, while Feldman was still an officer and director of Telx. At that time, the company offered senior secured and convertible promissory notes at a 16% interest rate, due in June 2005, in a private placement transaction. After the subscription period, Telx issued notes with a face value of $7.05 million in return for $5.08 million in cash. Many of the Telx Defendants or their affiliates participated in this transaction.[3] Feldman was unaware of the Telx Defendants' participation until he received documents in mid–2005 as a result of the section 220 action, but was aware of the private placement itself at the time of the offering. Notably, Feldman does not allege that he or any other stockholder was precluded from participating in the private placement.

In April 2003, Telx offered an exchange transaction to the purchasers of the 16% notes. The company thereby exchanged nearly $5.6 million in 16% notes for newly-issued 9% notes. Further, approximately $1.1 million in 16% notes were converted into 3.3 million shares of Telx common

---

1. The Telx Defendants also include The Cutaia Group, LLC, an entity controlled by Cutaia.

2. The facts herein are drawn from the well pleaded allegations in the complaint and certain documents that the complaint incorporates by reference. *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 69–70 (Del.1995); *Bergstein v. Texas Int'l Co.*, 453 A.2d 467, 469 (Del.Ch.1982).

3. Specifically, it is alleged that the following defendants and their affiliates received the

16% notes in the private placement: (i) Hitchcock and affiliates Avalon Financial Group, Ltd., Rosalie B. Hitchcock, and Margaret M. Hitchcock Fanning; (ii) Sessa; (iii) Cutaia (through The Cutaia Group, LLC); (iv) Lawrence and affiliate Joseph S. Lawrence, Jr., IRA; (v) J. Raymond and affiliates Barbara K. Raymond, James F. Fitzgerald IRA, Mystic Island Corporation, Arthur & Elanor Foss, John E. Friend, II, M.D. & Kimberly K. Raymond, John Friend LLC, Kevin Lynch Trust and Friend Family Revocable Trust; (vi) T. Raymond; and, (vii) Keenan.

stock. Just as they participated in the private placement a year before, the same Telx Defendants exchanged their 16% notes in this transaction.[4] Feldman, who was no longer at the company, knew nothing of the exchange itself until December 2003, and did not learn details of the Telx Defendants' participation therein until mid–2005.

Finally, in August 2003, Telx engaged in a recapitalization whereby the company issued convertible Series A preferred stock to investors in exchange for $7.8 million of Telx's debt and $3.8 million in cash.[5] Holders of approximately $4.8 million in 9% notes converted their principal plus accrued interest into Series A preferred stock.[6] Yet again, Telx directors and officers, including a majority of the Telx Defendants and their affiliates, were significant participants in the recapitalization,[7] and, yet again, Feldman did not learn of

this transaction or of the Telx Defendants' participation until long after the fact.[8]

In Count V of his complaint, Feldman alleges that, as a result of the private placement, the exchange offer, and the recapitalization (the "Dilutive Transactions"), the Telx Defendants wrongfully increased their own equity stakes in Telx, while simultaneously diluting the equity ownership of non-insider stockholders like himself. Indeed, Feldman states that before the Dilutive Transactions, he owned roughly 10% of Telx; afterwards, however, his stake fell to 1.5%. The Telx Defendants, their family members and their affiliates, taken as a group, ended up with holdings of approximately 60% of Telx's equity. As a result of the Telx Defendants' breaches of their fiduciary obligations that caused this dilution, Feldman requests the court award him monetary damages.

4. Specifically, it is alleged that the following defendants and their affiliates participated in the exchange transaction: (i) Hitchcock and affiliates Avalon Financial Group, Ltd., Rosalie B. Hitchcock, and Margaret M. Hitchcock Fanning; (ii) Sessa; (iii) Cutaia (through The Cutaia Group, LLC); (iv) Lawrence and affiliate Joseph S. Lawrence, Jr., IRA; (v) J. Raymond and affiliates Barbara K. Raymond, James F. Fitzgerald IRA, Mystic Island Corporation, Arthur & Elanor Foss, John E. Friend, II, M.D. & Kimberly K. Raymond, John Friend LLC, Kevin Lynch Trust and Friend Family Revocable Trust; (vi) T. Raymond; and, (vii) Keenan.

5. The Series A preferred stock was convertible into Telx common stock on a ten-to-one basis.

6. The Series A preferred stock was issued at four different prices depending upon the level of seniority of the debt exchanged: $1.80 per share for new capital and accrued interest and past-due debt; $2 per share for the senior secured 16% notes and the 9% notes; $3.40 per share for the subordinated convertible 16% notes; and $4 per share for 12% and 10% junior subordinated debt.

7. Specifically, it is alleged that the following defendants and their affiliates received Series A preferred stock in the recapitalization: (i) Hitchcock and affiliates Avalon Financial Group, Ltd., Rosalie B. Hitchcock, and Margaret M. Hitchcock Fanning; (ii) Sessa; (iii) Cutaia (through The Cutaia Group, LLC); (iv) Lawrence and affiliate Joseph S. Lawrence, Jr., IRA; (v) J. Raymond and affiliates Barbara K. Raymond, James F. Fitzgerald IRA, Mystic Island Corporation, Arthur & Elanor Foss, John E. Friend, II, M.D. & Kimberly K. Raymond, John Friend LLC, Kevin Lynch Trust and Friend Family Revocable Trust; (vi) T. Raymond; and, (vii) Keenan.

8. Furthermore, in September 2003, Telx conducted a ten-to-one reverse stock split in which the preferred stock acquired in the exchange transaction and convertible into common stock on a ten-to-one basis became convertible into common stock on a one-to-one basis. These transactions indicated a value for the common stock ranging from $0.18 to $0.40 per share (or $1.90 to $4 per share assuming that the convertible feature was adjusted to one-to-one following the reverse stock split).

### 2. *The 2003 Employee Stock Option Plan Grants*

In late 2003, the Telx board considered an Employee Stock Option Plan (the "ESOP") to allow key employees to purchase an interest in the company. The board approved the ESOP on February 5, 2004, and a majority of the Telx stockholders considered and approved it at the company's 2004 annual meeting on April 13, 2004. Pursuant to the ESOP, Cutaia, Lawrence, and T. Raymond received options to purchase 1.279 million shares of Telx Series A preferred stock at $2 per share.[9] Due to the relative paucity of documentary evidence relating to these grants, Feldman alleges that these options were never validly issued and that the agreements which support their issuance are post-dated forgeries.

Counts VI through XII of Feldman's complaint allege multiple causes of action against the Telx Defendants predicated on the ESOP. Feldman claims that the Telx Defendants failed to disclose material information to the Telx stockholders in connection with the stockholder vote on the ESOP at the annual meeting-namely, the intended recipients of the options and the number of options to be granted to each such recipient. He also alleges that the option grants to Cutaia, Lawrence, and T. Raymond violated the express terms of the ESOP, and thus constitute a breach of that contract. Feldman further claims that the grants violated 8 *Del. C.* § 157(b), that Cutaia, Lawrence, and T. Raymond were unjustly enriched at the expense of Telx, and that the Telx board members breached a fiduciary duty of good faith in allowing the options to be issued. Finally, the complaint alleges that the option grants to Cutaia, Lawrence, and T. Raymond constitute corporate waste. In connection with these causes of action, Feldman asks the court to rescind the options, to award rescissory and compensatory damages to Telx, and to order Cutaia, Lawrence, and T. Raymond to disgorge all profits, benefits, and other compensation obtained from the grants.[10]

### 3. *A Failed Merger Followed By A Stock Repurchase*

At an October 5, 2004 board meeting, Cutaia advised the directors that an expansion strategy the company had attempted to implement was no longer viable and that an exit event might provide maximum value to Telx stockholders. Heeding this advice, the board instructed the Telx officers to begin an auction process. In the three months that followed, Telx identified a pool of possible suitors, but subsequently narrowed the search to five likely buyers. As exploratory negotiations progressed, Switch & Data, Inc. came to the fore. Discussions between representatives of the two companies ultimately resulted in the approval and execution of a merger agreement that provided for a cash price of about $10 per Telx share.

Just over a month later, Switch & Data terminated the merger, citing issues discovered during its due diligence review of Telx. At the next board meeting, despite the reason given by Switch & Data for the termination, Cutaia told the board that, in his opinion, the merger fell through because Switch & Data was unable to obtain

---

9. Cutaia received 827,000 options, while Lawrence and T. Raymond received 326,000 and 126,000 options, respectively. A total of 1.75 million options were authorized under the ESOP.

10. The face of the complaint does not specifically allege that the option grants pursuant to the ESOP caused a wrongful dilution of Feldman's equity ownership in Telx. However, for purposes of this motion, the court assumes Count V applies to the option grants as well.

appropriate financing. Despite the fact that a failure-to-finance termination triggered a $2 million termination fee payable to Telx under the merger agreement, the board did not pursue any remedial action against Switch & Data.

Following the collapse of the merger, Cutaia advised the board on July 8, 2005 that Telx should pursue a stock buyback program in order to provide stockholders with liquidity. He suggested that such a transaction be priced in the $10 per share range, since a third party, Switch & Data, had made a bid for the company at that level.

The Telx board next met on July 28, 2005. Following a brief discussion regarding the legal implications of the proposed transaction, but not the fairness of the repurchase price, the board voted to repurchase $5 million of the company's securities at $10 per share. The repurchase was announced on August 29, 2005 and was open to holders of common and preferred stock (including directors and management), as well as all option and warrant holders.[11] At that time, the directors' and executives' share of outstanding securities equaled 42% of Telx's outstanding common stock, 37% of the outstanding Series A preferred stock, and 88.7% of the company's outstanding options and warrants. The transaction was oversubscribed, and the amount of securities purchased from each holder was determined based on a proration formula which took into account the net equity value of the securities owned by a subscriber.[12]

In Counts I to IV of his complaint, Feldman alleges that every aspect of the repurchase—from the price, to the proration formula, to the classes of securities that were eligible to participate—was unfairly structured to favor the Telx Defendants. Allegedly, the $10 per security price was "severely inflated" because, up until the time of the repurchase, Telx stock had never sold for more than $4 per share. Feldman claims that the Telx Defendants breached their duty of loyalty to Telx in approving this self-interested transaction, and that they bear the burden of establishing the entire fairness of the repurchase. Furthermore, Feldman alleges that the repurchase violated the capital sufficiency requirements of 8 *Del. C.* § 160(a)(1), and that the Telx Defendants are jointly and severally liable to Telx for the full amount of the repurchase pursuant to 8 *Del. C.* § 174. Finally, Feldman alleges that the Telx Defendants breached their duty of candor by disseminating a disclosure document in connection with the repurchase that contained material misstatements and omissions. As relief, Feldman requests a damages award for the company, or rescission of the repurchase of any Telx securities once owned by the Telx Defendants.

*4. The 2006 Merger With GI Partners*

During the spring and summer of 2006, Telx revived the auction process, again

11. The offered price was $10 per option or warrant, less the applicable exercise price thereof.

12. Telx would purchase from each tendering security holder securities having a net equity value equal to the lesser of (1) the net equity value of the securities tendered by such security holder, or (2) the proportionate net equity value represented by the tendered securities, as it related to the overall value of Telx's outstanding securities at the time. If some security holders elected to tender less than the proportionate net equity value of their securities, Telx would buy additional securities from those who tendered more than their proportionate net equity value on a pro rata basis. Furthermore, because the repurchase was oversubscribed, those who tendered securities, but who held more than one type, could designate which type of security Telx had to purchase first.

gauging the market's interest in a sale transaction. GI Partners emerged as a potential candidate, and, on September 17, 2006, it entered into a merger agreement with Telx. Three days later, acting pursuant to written consents, approximately 92% of the holders of Telx common stock and Series A preferred stock approved the merger agreement. Notice of the transaction was sent to all Telx stockholders on September 29, 2006, and Feldman received this notification the following day.[13] On October 3, 2006, the merger closed, with Telx becoming a wholly-owned subsidiary of GI Partners.

Under the terms of the agreement, Telx's stockholders received, in the aggregate, $213 million. All of the company's stock, option, and warrant holders were cashed out at approximately $14.87 per share (less the applicable exercise price for options and warrants). Cutaia received $4.7 million as a result of severance and bonus payments, as well as a $2 million per year consulting contract with GI Partners.

In Count XIII of his complaint, Feldman alleges that the materials disseminated in connection with the merger do not disclose the number of options held by Cutaia, Lawrence, and T. Raymond or the amount of the merger consideration they would receive by virtue of those holdings. Furthermore, the complaint states that, despite the Telx board's knowledge of certain facts demonstrating that the ESOP options held by these three individuals were invalid, the board members breached their fiduciary duty of loyalty by failing to prevent Cutaia, Lawrence, and T. Raymond from cashing out their options in the merger. Feldman alleges that this lack of oversight

allowed these three defendants to wrongly receive about $16.6 million of the merger consideration. He asks the court to award monetary damages to him and all similarly-situated former stockholders of Telx based on this alleged impropriety.

Count XIV of the complaint levels allegations at GI Partners. Feldman claims GI Partners aided and abetted the breaches of fiduciary duty committed by the members of the Telx board in connection with the merger, since GI Partners must have learned during the course of its due diligence that the options issued pursuant to the ESOP were invalid. Because it negotiated a merger agreement which provided for monetary compensation of these options, Feldman alleges that GI Partners should be held liable for money damages.

## C. The Procedural History Of This Litigation

As previously mentioned, Feldman filed the original complaint in this action on September 21, 2005, setting forth three counts relating to the repurchase transaction. Feldman amended his complaint for the first time on December 20, 2005, adding two more counts related to the repurchase and the Dilutive Transactions. The Telx Defendants moved to dismiss the amended complaint pursuant to Court of Chancery Rules 12(b)(6) and 23.1. In an April 5, 2006 memorandum opinion, the court denied that motion, holding that demand was excused and that the amended complaint stated claims for breach of the fiduciary duty of candor and for a violation of 8 Del. C. § 160.[14]

---

**13.** Although he received notice of the merger on September 30, 2006, the record shows that Feldman was aware of the imminent possibility of a transaction during this time frame. Motion practice dating back to at least early July 2006 placed Feldman on notice that Telx

was actively engaged in an auction process and was negotiating with potential bidders.

**14.** See generally Feldman v. Cutaia, 2006 WL 920420 (Del.Ch. Apr.5, 2006).

Thereafter, Feldman moved for leave to file a second amended complaint, which included counts related to the ESOP grants. The Telx Defendants did not oppose the motion, and Feldman filed his second amended complaint on September 22, 2006. Following Telx's merger with GI Partners, the Telx Defendants again moved to dismiss all the claims against them, and Feldman again moved to amend. The court granted Feldman's motion, and the third amended complaint, which is operative for present purposes, was filed on January 9, 2007.

The Telx Defendants moved to dismiss the operative complaint on January 26, 2007, relying on Court of Chancery Rules 12(b)(6) and 23.1. GI Partners followed suit three days later, basing its motion on Rule 12(b)(6), while asserting that Feldman lacks standing to bring claims against it. After briefing by the parties, the court held oral argument on May 15, 2007.

## II.

The Telx Defendants label Feldman as a frustrated former stockholder, bitter at the fact that, had he not chosen to sell 148,000 of his Telx shares in 2004 at $3.36 per share, he would have received over $2 million just two years later in the GI Partners merger that cashed out the company's equity holders at $14.87 per share. Substantively, they argue that all of Feldman's claims are derivative rather than direct, and now belong to GI Partners by operation of law. This analysis applies, the Telx Defendants say, even in light of the Delaware Supreme Court's recent decisions in *Gentile v. Rossette*[15] and *Gatz v. Ponsoldt.*[16] Finally, the Telx Defendants

contend that Count XI must be dismissed because Delaware law does not recognize an independent cause of action for violation of the fiduciary duty of good faith. According to GI Partners, Feldman's claim for aiding and abetting a breach of fiduciary duty in connection with the merger fails because the complaint does not establish that GI Partners knowingly participated in a breach of duty by the Telx board.

Feldman responds that Count V, his allegation of wrongful dilution, and Count XIII, his allegation of a fiduciary breach in connection with the GI Partners merger, are both direct claims, and can be properly maintained regardless of the fact that he no longer owns Telx stock. In addition, Feldman says that his claim against GI Partners for aiding and abetting survives a motion to dismiss because the complaint adequately alleges all necessary elements for that cause of action. Finally, due to what he labels egregious conduct on the part of the Telx Defendants in stymieing his efforts to gain information about the company's business, Feldman contends that the court should allow his remaining claims, which he admits are derivative in nature, to survive regardless of his technical lack of standing to prosecute them on behalf of Telx.

## III.

In considering a motion to dismiss under Court of Chancery Rule 12(b)(6), the court assumes the veracity of all well pleaded allegations in the complaint.[17] While specific allegations of fact, along with reasonable conclusions buttressed by specific allegations of fact, will

**15.** 906 A.2d 91 (Del.2006).

**16.** 925 A.2d 1265, 2007 WL 1120338 (Del. Apr. 16, 2007).

**17.** *In re General Motors (Hughes) S'holder Litig.,* 897 A.2d 162, 168 (Del.2006); *Kohls v. Kenetech Corp.,* 791 A.2d 763, 767 (Del.Ch. 2000).

sustain a compliant,[18] mere conclusions of law or fact are insufficient under this standard of review.[19] Indeed, a court should not "blindly accept as true all allegations, nor must it draw all inferences from them in the plaintiff's favor unless they are reasonable inferences."[20] In the end, a court will dismiss a complaint only if it determines "with reasonable certainty that, under any set of facts that could be proven to support the claims asserted, the plaintiff would not be entitled to relief."[21]

## IV.

■■■ As the Delaware Supreme Court made abundantly clear more than two decades ago in the seminal case of *Lewis v. Anderson*,[22] a corporate merger typically extinguishes a plaintiff's standing to maintain a derivative suit. In *Anderson*, while the plaintiff was litigating a derivative action, the defendant corporation merged with another company, and the plaintiff's stock was exchanged for that of the corporate defendant's new parent company.[23] The *Anderson* court affirmed the Court of Chancery's dismissal of the plaintiff's complaint for lack of standing, holding that 8 *Del. C.* § 327,[24] when read in conjunction with Court of Chancery Rule 23.1,[25] requires that a plaintiff not only be a stockholder at the time of the alleged wrongdoing, but that he maintain stockholder status in the corporate defendant throughout the litigation.[26] In so holding, the *Anderson* decision incisively observed that, at its base, a derivative claim is a property right owned by the nominal corporate defendant, and that such right flows to the acquiring corporation by operation of a merger.[27]

■■■ *Anderson* remains both theoretically and practically sound.[28] Thus, a

---

18. *White v. Panic*, 783 A.2d 543, 549 n. 12 (Del.2001).

19. *Bergstein*, 453 A.2d at 469.

20. *Grobow v. Perot*, 539 A.2d 180, 187 n. 6 (Del.1988).

21. *Id.*

22. 477 A.2d 1040, 1049 (Del.1984).

23. *Id.* at 1042.

24. Section 327 states:
 In any derivative suit instituted by a stockholder of a corporation, it shall be averred in the complaint that the plaintiff was a stockholder of the corporation at the time of the transaction of which such stockholder complains or that such stockholder's stock thereafter devolved upon such stockholder by operation of law.

25. Rule 23.1 provides:
 In a derivative action brought by 1 or more shareholders ... to enforce a right of the corporation ... the corporation ... having failed to assert a right which may properly be asserted by it, the complaint shall allege that the plaintiff was a shareholder ... at the time of the transaction of which the plaintiff complains or that the plaintiff's share ... thereafter devolved on the plaintiff by operation of law.

26. *Anderson*, 477 A.2d at 1046.

27. *Id.* at 1044.

28. As Vice Chancellor Noble observed:
 Delaware courts generally adhere to [the *Anderson* rule] because it is supported by important policy considerations. These considerations include theoretical underpinnings (as derivative actions involve a plaintiff who is enforcing rights of a separate entity; without ownership it is difficult to explain why a plaintiff has a right to bring a derivative claim) and practical underpinnings (namely, the court is attempting (a) to ensure that the derivative plaintiff is representative of the shareholders and has the incentive to pursue the litigation in the best interests of the shareholders and (b) to prevent "strike suits").
 *Strategic Asset Mgmt., Inc. v. Nicholson*, 2004 WL 2847875, at *2 (Del.Ch. Nov. 30, 2004) (internal footnote omitted).

plaintiff may avoid dismissal of his claims following a merger in only two distinct circumstances: where the claims asserted are direct, rather than derivative, or where one of the equitable exceptions recognized in *Anderson* applies. Since Feldman ceased to be a Telx stockholder following the merger with GI Partners, he faces dismissal of his complaint unless the court finds there is merit to his contention that one of those narrow escape hatches salvages his claims.

### A. Count V, Feldman's Claim Of Wrongful Dilution, Is A Derivative Cause Of Action[29]

 The case of *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*[30] laid out the comprehensive framework a court must apply in determining whether a given cause of action is direct or derivative. *Tooley* held that this determination is based solely on two questions: "Who suffered the alleged harm ... and who would receive the benefit of the recovery or other remedy?"[31] If the corporation alone, rather than the individual stockholder, suffered the alleged harm, the corporation alone is entitled to recover, and the claim in question is derivative.[32] Alternatively, if the stockholder suffered harm independent of any injury to the corporation that would entitle him to an individualized recovery, the cause of action is direct.[33]

 A claim for wrongful equity dilution is premised on the notion that the corporation, by issuing additional equity for insufficient consideration, made the complaining stockholder's stake less valuable. Equity dilution claims are typically viewed as derivative under Delaware law. In terms of a *Tooley* analysis, the alleged injury is to the corporation because "it falls upon all shareholders equally and falls only upon the individual shareholder in relation to his proportionate share of stock as a result of the direct injury being done to the corporation."[34] As the court recently observed:

29. At the outset, the court notes that the Telx Defendants' failure to argue in their prior motions that Count V is derivative does not effect their ability to do so now. Waiver is the voluntary relinquishment of a known right, and may be express or implied. *TriState Courier & Carriage, Inc. v. Berryman,* 2004 WL 835886, at *9 n. 123 (Del.Ch. Apr. 15, 2004). Given that equity dilution claims like Count V are ordinarily derivative, the court cannot interpret the Telx Defendants' position in their prior briefing as a knowing waiver of the right to argue that the nature of a claim is what it normally is conceived as being. *See In re First Interstate Bancorp Consol. S'holder Litig.,* 729 A.2d 851, 859–60 (Del. Ch.1998) (declining to treat the defendants' stipulation to a class certification order prior to the closing of a merger as a waiver of the right to argue that the plaintiffs lacked standing to bring derivative claims following the merger's consummation). In any event, Feldman concedes he did not argue in his prior briefing that Count V was a direct claim.

30. 845 A.2d 1031 (Del.2004).

31. *Id.* at 1033.

32. *Id.* at 1036 (citing with approval *Agostino v. Hicks,* 2004 WL 443987, at *7 (Del.Ch. Mar. 11, 2004) ("Looking at the body of the complaint and considering the nature of the wrong alleged and the relief requested, has the plaintiff demonstrated that he or she can prevail without showing an injury to the corporation?")).

33. *Id.* at 1039 ("The stockholder's claimed direct injury must be independent of any alleged injury to the corporation. The stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation.").

34. *In re Berkshire Realty Co., Inc.,* 2002 WL 31888345, at *4 (Del.Ch. Dec. 18, 2002). *See also Gentile,* 906 A.2d at 100 ("[Dilution] claims are not normally regarded as direct, because any dilution in value of the corporation's stock is merely the unavoidable result (from an accounting standpoint) of the reduc-

Mere claims of dilution, without more, cannot convert a claim traditionally understood as derivative into a direct one. Clearly, a corporation is free to enter into ... numerous transactions, all of which may result legitimately in the dilution [of present equity holders]. Such a dilution is a natural and necessary consequence of investing in a corporation.... The only cognizable injuries, if any, would be a failure to act in the best interest of [the corporation].... These alleged harms [are] inflicted on the corporation itself and [can] be asserted only by or on behalf of the corporation.[35]

In Count V, Feldman alleges that the Dilutive Transactions and the ESOP grants resulted in Telx issuing equity for inadequate consideration, and that his equity holdings in the company were thereby diluted. Traditionally, then, the harm Feldman alleges from these transactions fell upon the corporation rather than any stockholder individually.[36]

Feldman argues, however, that his particular dilution claims can be brought directly based on recent Delaware precedent. In Gentile, the Delaware Supreme Court recognized that a stockholder may bring a particular "species of corporate overpayment claim" either directly or derivatively.[37] To adequately plead this type of equity dilution claim, a plaintiff must allege facts showing that:

(1) a stockholder having majority or effective control [caused] the corporation to issue "excessive" shares of its stock in exchange for assets of the controlling stockholder that have a lesser value; and

(2) the exchange [caused] an increase in the percentage of the outstanding shares owned by the controlling stockholder, and a corresponding decrease in the share percentage owned by the public (minority) shareholders.[38]

In an extrapolation of Gentile, the Gatz case involved William Ponsoldt, a minority stockholder who, through entities owned or controlled by him, exercised de facto control over Regency Affiliates, Inc.[39] Pursuant to an intricate two-step transaction, Ponsoldt increased his stock ownership of Regency to an absolute majority interest, while simultaneously selling that majority stake for cash to a third party.[40] The public stockholders, who owned approximately 62% of the Regency's stock before the transaction, received no valuable consideration as a result of the Ponsoldt scheme and found themselves owning just 40% of the company's equity in the

---

tion in the value of the entire corporate entity, of which each share of equity represents an equal fraction.'').

**35.** *Oliver v. Boston Univ.*, 2006 WL 1064169, at \*17 (Del.Ch. Apr. 14, 2006).

**36.** *See, e.g., Kramer v. W. Pac. Indus.*, 546 A.2d 348 (Del.1988) (holding the excessive issuance of stock options and payment of fees to executives to be derivative); *Noerr v. Greenwood*, 1997 WL 419633, at \*2 (Del.Ch. Jul. 16, 1997) (characterizing suit based on self-interested option grants as derivative and cited with approval by *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 891 A.2d 150, 155 n. 3 (Del. Ch.2005)). *See also Winston v. Mandor*, 710

A.2d 835, 845 (Del.Ch.1997) (holding that a claim arising from the exchange of corporate stock for insufficient consideration was derivative because it equally harmed all of the corporation's stockholders); *Avacus Partners, L.P. v. Brian*, 1990 WL 161909, at \*6 (Del.Ch. Oct. 24, 1990) (characterizing an excessive exchange of stock as derivative).

**37.** *Gentile*, 906 A.2d at 99–100.

**38.** *Id.* at 100.

**39.** 925 A.2d 1265, 1269–71, 2007 WL 1120338, at \*2–4.

**40.** *Id.* at 1271–73, 2007 WL 1120338 at \*4–5.

aftermath.[41] Deconstructing the substance of the deal from its form, the Delaware Supreme Court held that even though a third party, rather than Regency's *de facto* controlling stockholder at the time of the transaction, was the ultimate recipient of the stock issued, the plaintiffs were entitled to bring their dilution claims as direct causes of action.[42]

■ *Gentile* and *Gatz* are predicated on the idea that transactions of this type result in an improper transfer of both economic value and voting power from the minority to the controlling stockholder.[43] Thus, it is clear from those decisions that the Delaware Supreme Court intended to confine the scope of its rulings to only those situations where a controlling stockholder exists.[44] Indeed, any other interpretation would swallow the general rule that equity dilution claims are solely derivative, and would cast great doubt on the continuing vitality of the *Tooley* framework. Neither of these outcomes is warranted. Indeed, the harm *Gentile* and *Gatz* seek to remedy can only arise when a controlling stockholder, with sufficient power to manipulate the corporate processes, engineers a dilutive transaction whereby that stockholder receives an exclusive benefit of increased equity ownership and voting power for inadequate consideration. Because neither the Dilutive

Transactions nor the ESOP grants conferred an exclusive benefit on any controlling stockholder of Telx, Feldman cannot bring Count V as a direct claim.

Feldman suggests that the complaint alleges the presence of a controlling stockholder because "the Telx board, including [their] families and the entities they control, collectively owned 60% of the company's equity."[45] As was recently recognized, such a contention fails to allege the presence of a controlling stockholder.

In *In re PNB Holding Co. Shareholders Litigation*, the court reiterated the well-established test for a controlling stockholder under Delaware law, noting that situation exists only when a stockholder: "(1) owns more than 50% of the voting power of a corporation; or (2) exercises control over the business and affairs of the corporation."[46] The *PNB* decision held that the test for control was not satisfied because the combined stockholdings of the corporation's directors (33.5%) were less than a majority of the corporation's stock.[47] As importantly, the court also rejected the suggestion that the stockholdings of those directors could be aggregated, either amongst themselves or with their family members, to satisfy the control test absent a voting agreement among the group or a "blood pact to act together."[48] Directors,

---

41. *Id.* at 1272–73, 2007 WL 1120338 at *5.

42. *Id.* at 1278–81, 2007 WL 1120338 at *11–13.

43. *Id.* at 1277–79, 2007 WL 1120338 at *10–11; *Gentile*, 906 A.2d at 100

44. Two recent cases applying *Gentile* support this interpretation. *See Bakerman v. Sidney Frank Importing Co., Inc.*, 2006 WL 3927242, at *19 (Del.Ch. Oct. 16, 2006) (holding that a plaintiff's claims for deprivation of his voting rights and right to consent to a transaction alleged "harm unique to [the plaintiff] that allegedly benefited certain controlling mem-

bers of the LLC"); *Shamrock Holdings v. Arenson*, 456 F.Supp.2d 599, 607–08 (D.Del. 2006) (requiring a majority stockholder to bring a direct claim for dilution under *Gentile*).

45. Plaintiff's Ans. Br. 28 n. 19 (citing Compl. ¶ 1).

46. 2006 WL 2403999, at *9 (Del.Ch. Aug. 18, 2006).

47. *Id.* at *10.

48. *Id.*

as a group, are charged by statute with a duty to manage the business and affairs of the corporation they serve,[49] but that simple fact does not make them, either singly or collectively, a controlling stockholder, no matter what their individual or collective stockholdings may be.

The facts in this case are analogous to those in *PNB*. Feldman's complaint alleges that the individual director-defendants owned 40.55% of Telx's stock, less than an absolute majority, but does not allege any voting agreement or "blood pact" among them. Moreover, the defendants note that the remaining percentage of stock owned by family members or familial investments of the individual director-defendants that purportedly placed them in majority control of Telx also is not alleged to be the subject of a voting agreement or any other pact that would allow the court to reasonably infer that those particular stockholders were ever acting in concert with the individual director-defendants.[50] For these reasons, the court, consistent with *PNB*, cannot aggregate the stockholdings of a company's directors to satisfy the controlling stockholder requirement of *Gentile* and *Gatz*. Thus, Feldman cannot maintain a direct claim for equity dilution.

■■■■ Count V also fails to allege that the Telx directors exclusively benefited

from the Dilutive Transactions. Notably, Feldman does not allege that he had no prior knowledge of the private placement. Nor does Feldman allege that he, or any other person who was a Telx stockholder at the time, was barred from participating in that transaction. Indeed, it is apparent that a great number of stockholders other than the Telx directors and their affiliates purchased notes in the private placement, and reasonable to infer that the same opportunity was available to Feldman.

These same deficiencies in Feldman's pleading not only undermine his assertion of inequitable dilution in the private placement, they are fatal to his claims that the exchange transaction and the recapitalization were unfair as well. Those transactions were a byproduct of the private placement, and, naturally, only those individuals who held 16% notes issued in that first transaction were eligible to participate in the two later transactions undertaken to refinance those debt obligations. Indeed, Feldman does not challenge in their own right the final two events in this three-part series. Rather, he objects solely because the exchange transaction and the recapitalization derive from the private placement, a transaction for which, by his own admission, Telx received substantial monetary consideration.[51] The complaint,

---

**49.** 8 *Del. C.* § 141(a).

**50.** These holdings included: (i) 13.5% of Telx's stock owned by "familial, personal and business investments" of twelve individuals and entities allegedly controlled by J. Raymond; (ii) 2.8% of the stock held by "familial and business investments" allegedly controlled by Hitchcock; (iii) 2.5% of the stock allegedly controlled by Werner, but held by an entity; and, (iv) 0.65% of the stock in a "familial investment" allegedly controlled by Lawrence.

**51.** Although Feldman claims that a "significant amount" of the 16% notes the Telx De-

fendants received in the private placement were for "grossly inadequate or no consideration," this assertion is conclusory, and is belied by other portions of his complaint wherein he admits that $5.08 million in cash was, in fact, tendered in exchange for the $7.05 million in notes. Although there is no qualitative standard for the amount of "excessive shares" that a controlling stockholder must receive for inadequate consideration in order to state a claim for equity dilution, the court observes that the allegations here stand in stark contrast to the allegations present in the *Gentile* line of cases. *See, e.g., In re Tri–Star Pictures, Inc. Litig.,* 634 A.2d 319, 322, 331 (Del.1993) (discussing a 44% equity dilu-

therefore, does not adequately allege that the Telx directors received an exclusive benefit from the Dilutive Transactions.

This same analysis applies with equal effect to the ESOP grants. For Feldman to state a direct claim under *Gentile*, the court would have to infer that Cutaia and Lawrence, the only two Telx board members who received options, exerted enough pressure and influence over the remaining Telx directors that those two individuals should be considered a controlling stockholder for purposes of the ESOP grants. Not only has Feldman failed to include any facts in his complaint from which the court could draw such an inference, he fails to allege that Cutaia and Lawrence were the exclusive beneficiaries of the ESOP. Tellingly, Feldman does not challenge any of the options granted to other Telx employees under that plan. Thus, even under the rubric of *Gentile* and *Gatz*, the equity dilution claim embodied in Count V regarding the stock option grants under the ESOP is solely derivative in nature.

**B.** *Feldman's Claim That The Individual Defendants Breached Their Fiduciary Duties In Connection With The Merger Is Derivative[52]*

■ Count XIII alleges a breach of fiduciary duty by the Telx board for its purported failure to consider the validity of the options granted to Cutaia, Lawrence, and T. Raymond under the ESOP when it negotiated and approved the merger with GI Partners. Count XIII, based as it is on the premise that the Telx directors were under a fiduciary obligation (at the time of the merger) to reconsider the validity of options issued pursuant to the ESOP, is a derivative claim.

Pursuant to *Tooley*, the harm flowing from the Telx directors' purported breach of fiduciary duty in Count XIII is the same type of harm that allegedly resulted from the options grants in the first place, *i.e.* a harm generated by corporate overpayment. As discussed at length above, all of Feldman's claims with respect to the issuance of the options are derivative according to established Delaware law.[53] The corporation suffered a dilution in value as a result of the issuance of the options. In the absence of a controlling stockholder, "such equal 'injury' to the [company's] shares resulting from a corporate overpayment is not viewed as, or equated with, harm to specific shareholders individually."[54]

This type of factual scenario—a plaintiff creatively attempting to recast a derivative

---

tion in which the corporation received subsidiaries of the majority stockholder that allegedly had been stripped of their assets and fraudulently overvalued); *Gatz*, 925 A.2d at 1272, 2007 WL 1120338, at *5 (alleging a 22% equity dilution for "no financial or economic benefit" to the company); *Gentile*, 906 A.2d at 94–95 (discussing a 32% equity dilution where the defendant exchanged $2.2 million of debt into equity worth 110 times the amount of the debt).

**52.** Because the court finds that Count XIII is derivative, it is unnecessary to consider the substantive merits of that claim. Even so, it is worthwhile to mention that only two Telx directors (Cutaia and Lawrence) owned any of the options challenged by Feldman. Not

only was a majority of the board independent and disinterested in making the decision to honor options granted under the 2003 ESOP, but, as a practical matter, the other directors' share of the merger proceeds (from their stock ownership) was decreased as a result of that decision. Thus, even if Count XIII could be construed as direct, Feldman has not rebutted the business judgment rule to save that claim from dismissal on the merits.

**53.** *See, e.g.*, *Gentile*, 906 A.2d at 99 (citing *Kramer* for the proposition that the excessive issuance of stock options, absent a controlling stockholder, is a derivative claim).

**54.** *See id.* (analyzing a corporate overpayment claim within the *Tooley* framework).

claim by alleging the same fundamental harm in a slightly different way-is disfavored by Delaware courts. Affirming this court's decision, the Delaware Supreme Court in *In re J.P. Morgan Chase & Co. Shareholder Litigation* rejected a plaintiff's effort to bootstrap the harm and damages causatively linked to a derivative claim onto what, according to that plaintiff, was an independently arising direct cause of action.[55] Justice Jacobs stated that dismissal is appropriate in such a case "because 'the damages allegedly flowing from the [purportedly direct claim] are exactly the same as those suffered [by the corporation] in the underlying [derivative] claim, [and thus] the injury alleged in the complaint is properly regarded as injury to the corporation and not to the class.' "[56] That instruction resonates here, and supports the conclusion that Count XIII is derivative.[57]

## C. *An Exception To The Contemporaneous Ownership Requirement Does Not Apply In This Case*

Having determined that Feldman may not bring Counts V and XIII directly, the court is faced with his admission that the remaining claims brought against the Telx Defendants are derivative. Thus, while the court need not analyze those claims under *Tooley* to test whether they can be sustained as direct causes of action, it must still decide whether Feldman should be allowed to proceed with his derivative claims despite his present lack of stock ownership.

As mentioned above, the continuous ownership rule, as embodied by section 327 and Rule 23.1, bars a former corporate stockholder, who lost that status as a result of a merger, from maintaining a derivative claim on behalf of the company.[58] This basic tenet of Delaware law exists, among other reasons, to ensure that a derivative plaintiff truly represents the interests of the corporation in bringing a lawsuit.[59]

Although this requirement of continuous ownership is a "bright line rule" which is "adhered to closely" by Delaware courts,[60] narrow exceptions do exist to the general proposition that a merger extinguishes a derivative plaintiff's standing. As decisions interpreting *Anderson* have observed, a court will allow a former stockholder to proceed with a derivative case if the merger itself is fraudulent, "being perpetrated merely to deprive shareholders of ... standing," or if the merger is "in reality a reorganization which does not

---

**55.** 906 A.2d 766, 771–774 (Del.2006).

**56.** *Id.* at 770 (quoting *J.P. Morgan*, 2005 WL 1076069, at *12).

**57.** Although Feldman omits discussing it in his answering brief, Count XIII also alleges that the Telx board failed to disclose material information with respect to the merger-namely, the purported invalidity of the options. Directors of Delaware corporations are not required to disclose unproven allegations which they deny. *See, e.g., Loudon v. Archer–Daniels–Midland Co.*, 700 A.2d 135, 145 (Del. 1997) ("[The] plaintiff's argument ... would have the board confess to wrongdoing prior

to any adjudication of guilt. This is precisely the situation the self-flagellation rule was designed to prevent.").

**58.** *Anderson*, 477 A.2d at 1046, 1049.

**59.** *Nicholson*, 2004 WL 2847875, at *2.

**60.** *In re New Valley Corp. Deriv. Litig.*, 2004 WL 1700530, at *3 (Del.Ch. Jun. 28, 2004); *Ash v. McCall*, 2000 WL 1370341, at *11 (Del.Ch. Sept.15, 2000). *See also First Interstate*, 729 A.2d at 868 (noting that Anderson is "clear and controlling" as to extinguishment of a plaintiff's standing post-merger).

affect the plaintiff's ownership of the business enterprise."[61]

■ Feldman's argument that the first *Anderson* exception saves his derivative claims is without merit.[62] The facts alleged show that the merger was the culmination of a two-year process, beginning eleven months before Feldman filed this lawsuit, pursuant to which Telx sought to sell itself.[63] The court cannot infer that the Telx Defendants even considered, let alone were principally motivated by, the pendency of this case when they decided to sell the company to GI Partners. The fact that an unrelated third party agreed to pay nearly $15 per share for Telx's stock-a price that Feldman does not allege was inadequate and is several times greater than his own estimates of the company's value-supports the logical conclusion that the merger was neither fraudulent nor conducted merely to terminate this lawsuit.

■ On the basis of a few quotations taken from opinions commenting on the sometimes harsh rigidity of the contemporaneous ownership rule,[64] Feldman argues for a new exception—if corporate defendants engage in conduct rising to the level of an abuse of the discovery process, a court should ignore the effects of a merger and allow a former stockholder to proceed with derivative claims. The court declines to recognize a new exception on these grounds as both unnecessary and unwise. Discovery abuses and other improper litigation tactics are properly remedied by sanction under the rules of the court. Such conduct is not a proper basis on which to continue litigation once standing is lost. Thus, Feldman can no longer maintain Counts I through XIII because the merger terminated his standing to do so.[65]

---

**61.** *Lewis v. Ward*, 852 A.2d 896, 899 (Del. 2004). These exceptions find their genesis in two decisions which predate *Anderson*. *See Bokat v. Getty Oil Co.*, 262 A.2d 246, 249 (Del.1970) (discussing the "sole purpose" exception to the post-merger standing rule later clarified in *Anderson*); *Schreiber v. Carney*, 447 A.2d 17, 21–22 (Del.Ch.1982) (discussing what amounts to the "mere organization" exception in *Anderson* by noting that a derivative plaintiff whose shares of the nominal defendant were exchanged for equivalent stock ownership in a new company through a merger should be permitted to continue a derivative suit).

**62.** Feldman does not argue that the "mere reorganization" exception applies here.

**63.** The board began the auction process in October 2004, and Feldman filed his complaint on September 21, 2005.

**64.** For example, Feldman says that Chancellor Chandler's recent decision in *Ryan v. Gifford*, 918 A.2d 341 (Del.Ch.2007), stands for the proposition that the sole purpose of section 327 is to "prevent the purchasing of shares in order to maintain a derivative action attacking transactions that occurred before the purchase," and that the continuous stock ownership requirement is always applied leniently in cases not implicating this purpose. As other cases make clear, however, section 327 functions both to prevent strike suits, as well as to ensure that a derivative plaintiff is acting in the corporation's best interests by litigating a claim. *See, e.g., Nicholson*, 2004 WL 2847875, at *2 (discussing both purposes of section 327). The *Ryan* decision had no occasion to discuss this second purpose of section 327, and Feldman's intimation that strike suits are the lone evil section 327 seeks to remedy is disingenuous.

**65.** The court need not address whether Count XI adequately states a duty of loyalty claim, because that cause of action is admittedly derivative in nature. However, the pleading of Count XI, given that it primarily alleges a breach of the duty of good faith, is suspect given the Delaware Supreme Court's recent decision in *Stone v. Ritter*, 911 A.2d 362 (Del. 2006), which held that Delaware law does not recognize an independent cause of action for violation of the duty of good faith.

D. *Count XIV Against GI Partners Fails For Lack Of Standing*

■ Before illustrating why Feldman lacks standing to bring an aiding and abetting claim against GI Partners, it is necessary to examine Feldman's contentions on this point. He does not challenge the overall consideration paid by GI Partners in the merger. Nor does Feldman take issue with the allocation of the merger proceeds with respect to those options he believes were validly issued. Rather, Feldman only argues that GI Partners, who had no involvement in the actual granting of the ESOP options in the first place, must have known that the options given to Cutaia, Lawrence, and T. Raymond several years earlier were invalid. According to Feldman, it was simply GI Partners's decision to enter into a merger agreement allocating consideration to the options held by these three individuals which constituted aiding and abetting a fiduciary breach by the Telx board.

Count XIV, then, essentially uses a secondary liability theory to deflect toward GI Partners the substantive claim brought in Count XIII against the Telx directors. The court has found that Count XIII is derivative. Prior decisions of this court have validated the unsurprising proposition that an aiding and abetting claim premised on a derivative cause of action is necessarily derivative itself.[66] Therefore, Feldman lacks standing to pursue Count XIV, and that claim must be dismissed.[67]

## V.

For the foregoing reasons, the motions to dismiss of the Telx Defendants and GI

---

66. *See, e.g., Manzo v. Rite Aid Corp.,* 2002 WL 31926606, at *6 (Del.Ch. Dec. 19, 2002) (dismissing an aiding and abetting claim because the plaintiff lacked standing to bring the breach of fiduciary duty claims on which it was premised), *aff'd by table decision,* 825 A.2d 239 (Del.2003); *First Interstate,* 729 A.2d at 864 ("If, as [the court has] found to be the case, the claims of primary liability against the defendant directors belong to the corporation and could only be maintained by [the plaintiff] in a derivative capacity, that finding logically applies with equal force to the alleged claims of secondary liability against [an alleged aider and abettor]."); *In re Rexene Corp. S'holders Litig.,* 1991 WL 77529, at *4 (Del.Ch. May 8, 1991) (dismissing aiding and abetting claims because of dismissal of breach of fiduciary duty claims for lack of standing).

67. Count XIV is also substantively weak. GI Partners's knowledge that written board resolutions did not exist to document the exact dates of the option grants or the number of options granted to certain individuals cannot automatically translate into notice its part that the options issued to Cutaia, Lawrence, and T. Raymond were statutorily noncompliant under 8 *Del. C.* § 157(b). While airtight written documentation of a resolution granting options is a prudent course of action for directors who wish to avoid future legal challenges, section 157(b) does not expressly require that the resolution be included in the minutes of the board meeting at which it was adopted or that the resolution be in writing. Given the representation and warranty Telx provided to GI Partners in the merger agreement that the company was required to honor the options, and given that this court has, on previous occasions, considered extrinsic evidence in determining whether a grant of stock options complied with section 157(b), GI Partners could have believed that alternative documentation provided during due diligence (such as options agreements and written board minutes showing director approval of the ESOP itself) was sufficient under the statute. *See Sai Man Jai, Ltd. v. Personal Computer Card Corp.,* 1991 WL 110458, at *1 (Del.Ch. June 18, 1991) (relying on testimony of the directors and the presence or absence of written stock option agreements to determine whether, in fact, the board ever passed a resolution granting stock options to the plaintiff). Thus, the complaint does not adequately allege knowing participation on the part of GI Partners, a *prima facie* requirement for an aiding and abetting claim. *See Malpiede v. Townson,* 780 A.2d 1075, 1096 (Del.2001) (listing the four substantive elements required for an aiding and abetting count to survive a Rule 12(b)(6) challenge).

Partners are GRANTED. IT IS SO OR-
DERED.