# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CHESTER COUNTY EMPLOYEES' RETIREMENT FUND, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | C.A. No. 11058-VCMR |
| NEW RESIDENTIAL INVESTMENT CORP., WESLEY R. EDENS, MICHAEL NIERENBERG, ALAN L. TYSON, DAVID SALTZMAN, KEVIN J. FINNERTY, DOUGLAS L. JACOBS, FIG LLC, FORTRESS INVESTMENT GROUP LLC and FORTRESS OPERATING ENTITY I LP, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted:  July 14, 2016
Date Decided:  October 7, 2016

Michael Hanrahan, Paul A. Fioravanti, Jr., Corinne Elise Amato, and Kevin H. Davenport, PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware;  Mark A. Topaz, Lee D. Rudy, Michael C. Wagner, and Justin O. Reliford, KESSLER TOPAZ MELTZER & CHECK LLP, Radnor, Pennsylvania;  *Attorneys for Plaintiff.*

Robert S. Saunders, Ronald N. Brown, III, and Sarah R. Martin, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware;  Scott D. Musoff, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, New York, New York;  *Attorneys for Defendants.*

**MONTGOMERY-REEVES, Vice Chancellor.**

In this action, a stockholder of New Residential Corp. ("New Residential") asserts direct and derivative breach of fiduciary duty claims against the members of the New Residential board of directors, New Residential's manager FIG LLC ("FIG"), FIG's owner Fortress Operating Entity I LP ("FOE I"), and Fortress Investment Group LLC ("Fortress"), which allegedly controls New Residential, FIG, and FOE I. Plaintiff alleges that the Defendants caused New Residential to overpay for the assets of Home Loan Servicing Solutions, Ltd. ("HLSS") in order to advantage other real estate assets of Fortress and to maximize management fees, incentive compensation, and stock option awards to Fortress and its affiliates.

Plaintiff also seeks a declaratory judgment that certain limitations on the fiduciary duties of Fortress affiliates in the New Residential certificate of incorporation and limitations on FIG's liability in the New Residential management agreement are not valid defenses in this case. Similarly, Plaintiff seeks a declaratory judgment that a termination agreement between HLSS and New Residential purporting to release all New Residential stockholder claims against HLSS is not a valid defense in this action.

Defendants move to dismiss this complaint under Court of Chancery Rules 23.1 and 12(b)(6). Defendants argue that all of Plaintiff's claims are derivative because they amount to claims for corporate overpayment. Defendants contend that a majority of the New Residential board is disinterested and independent, and

1

that even if a majority of the board is beholden to Fortress, Fortress is not interested in the underlying transactions. Defendants also argue that the complaint should be dismissed as to Fortress, FOE I, and FIG because they do not owe fiduciary duties to New Residential. As to the declaratory judgment claims, Defendants contend that Plaintiff's claims are not ripe because Defendants have not raised the certificate of incorporation, management agreement, or termination agreement as defenses.

In this Memorandum Opinion, I hold that the facts alleged give rise to a derivative claim. Plaintiff, however, has not pled particularized facts sufficient to infer that Fortress has a material interest in the challenged transactions. As a result, demand is not excused for the HLSS asset purchase and the ancillary transactions challenged in the complaint. Further, I hold that only the facial challenge to the New Residential certificate of incorporation is ripe for judicial review.

I.     **BACKGROUND**

The facts outlined in this opinion derive from Plaintiff's Amended and Supplemented Verified Class Action and Derivative Complaint (the "Complaint" or "Amended Complaint") and the documents it incorporates by reference.[1]

---

[1]     *In re Morton's Rest. Gp., Inc. S'holders Litig.*, 74 A.3d 656, 659 n.3 (Del. Ch. 2013) ("To be incorporated by reference, the complaint must make a clear, definite

2

**A.     Parties and Relevant Non-Parties**

Plaintiff Chester County Employees' Retirement Fund is a stockholder of New Residential.

Nominal defendant New Residential is a publically traded Real Estate Investment Trust ("REIT") that primarily invests in and manages residential real estate, including excess mortgage servicing rights and residential mortgage-backed securities.  Newcastle Investment Corp. ("Newcastle") formed New Residential as a wholly owned subsidiary and spun it off to Newcastle stockholders on May 15, 2013.  New Residential is a "permanent capital vehicle" in the Fortress web of companies.[2]  New Residential stock trades on the New York Stock Exchange under the symbol NRZ.

Defendant FIG managed New Residential pursuant to the Second Amended and Restated Management and Advisory Agreement, dated August 5, 2014, (the "Management Agreement") at the time of the challenged transactions.[3]  All New Residential officers and employees are FIG employees.  Defendant FOE I is the

---

and substantial reference to the documents."  (quoting *DeLuca v. AccessIT Gp., Inc.*, 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010)) (internal quotation marks omitted)).

[2]     Compl. ¶ 13.

[3]     After the HLSS transactions, FIG and New Residential executed the Third Amended and Restated Management and Advisory Agreement.

sole managing member of FIG. FIG Corp., is the general partner of FOE I. Defendant Fortress allegedly owns 100% of the stock of FIG Corp.[4]

Fortress managed $67.5 billion in assets as of December 31, 2014. As of that date, Fortress and its affiliates and principals together owned 2.4 million New Residential shares and 8.9 million options for New Residential shares, amounting to 7.4% of the common shares on a fully diluted basis.[5]

Nationstar Mortgage Holdings, Inc. ("Nationstar") and Springleaf Holdings, Inc. ("Springleaf") are companies in which Fortress indirectly owns majority equity stakes. Fortress affiliates own 74.7% of Nationstar and 85.3% of Springleaf Financial Holdings LLC. Springleaf Financial Holdings LLC owns 74.8% of the equity of Springleaf.[6]

HLSS is a publicly traded company that owns mortgage-servicing rights ("MSRs"), which are rights to fees from servicing mortgage loans, and Excess MSRs, which are rights to fees on mortgages serviced by another party. Plaintiff alleges that Ocwen Financial Corp. ("Ocwen") is the servicer on the underlying

---

[4]     Compl. ¶¶ 40, 42.

[5]     *Id.* ¶ 52.

[6]     *Id.* ¶¶ 87, 94.

loans for many HLSS Excess MSRs, and if Ocwen were terminated as the servicer, HLSS has the potential to lose the value of its Excess MSRs.[7]

Defendants Wesley R. Edens, Kevin J. Finnerty, Douglas L. Jacobs, Michael Nierenberg, David Saltzman, and Alan L. Tyson are New Residential directors. Edens is a founder, principal, and co-chairman of Fortress. He is responsible for the private equity and publically traded alternative investment business of Fortress. Edens owns about 23.2% of the Fortress Class A shares and about 27.9% of the Fortress Class B shares. In 2014, Edens received $4,022,668 in compensation from Fortress, and he received distributions of $48,518,051 from Fortress private equity funds. Edens is a beneficial owner of FOE I. Edens also is a director of FIG and numerous other Fortress entities.[8]

Finnerty serves as both a New Residential director and a Newcastle director. Finnerty received $125,009 in compensation from New Residential and $125,000 in compensation from Newcastle in 2014. In 2009, Finnerty received a $500,000 personal loan from Edens and a $500,000 personal loan from Randal A. Nardone, another Fortress principal. Plaintiff alleges that the loans have been listed in every

---

[7]    *Id.* ¶¶ 97, 103.

[8]    *Id.* ¶¶ 15, 17, 18. The Complaint does not identify other beneficial owners of FOE I.

5

Newcastle proxy statement from 2010 through 2015, indicating that they have not been repaid.[9]

Jacobs is a New Residential director and has been a Fortress director since 2007. He also has been a director of Springleaf since 2010. Before becoming a Fortress director in 2007, Jacobs was the CEO and chairman of the board of Global Signal, Inc. (another Fortress affiliate) from 2004 to 2007. In 2014, from his directorships, Jacobs received $135,004 from New Residential, $239,999 from Fortress, and $80,000 from Springleaf.[10]

Nierenberg has been both a director and the CEO of New Residential since November 2013. Because FIG manages New Residential, FIG employs Nierenberg as the New Residential CEO. Nierenberg also is a Managing Director at Fortress and is paid as a Fortress employee. Part of his compensation includes "tandem awards" of options for New Residential stock under the New Residential Nonqualified Stock Option and Incentive Award Plan, adopted April 29, 2013 (the "Stock Options Plan").[11]

Saltzman is a New Residential director. He also is the Executive Director of the Robin Hood Foundation, a charitable organization. The Complaint alleges that

---

[9]     *Id.* ¶¶ 19-20, 23.

[10]    *Id.* ¶¶ 25-28.

[11]    *Id.* ¶¶ 35-36; Stock Options Plan § 5.5(c).

Michael Novogratz, one of the four Fortress principals, is a significant donor to the foundation. For his services as a New Residential director, Saltzman received $125,004 in 2014.[12]

Tyson is a New Residential director and a Newcastle director. In 2014, Tyson received $125,009 for his services as a New Residential director and $135,000 for his services as a Newcastle director.[13]

## B. Facts

### 1. FIG Management Agreement

Before New Residential's acquisition of the HLSS assets, FIG managed the New Residential business pursuant to the Management Agreement. FIG or its assignees received two types of compensation from New Residential under the Management Agreement: a management fee and incentive compensation. Every year, FIG was entitled to a management fee of 1.5% of New Residential's paid-in capital (adjusted to include equity capital of any New Residential subsidiaries), paid in monthly installments (the "Management Fee").[14] In addition to the

---

[12] Compl. ¶ 32-33.

[13] *Id.* ¶ 37-38.

[14] Management Agreement § 8(a) ("During the term of this Agreement . . . the Manager will receive an annual management fee (the 'Management Fee') equal to 1.50% of the Company's 'Gross Equity.' The Management Fee shall be calculated and paid monthly in arrears . . . .") Gross Equity means "(A) the sum of (i) the 'Total Equity,' plus (ii) the value of contributions made by partners other

7

Management Fee, FIG or its assignees were entitled to incentive compensation under the Management Agreement. The incentive compensation was essentially 25% of New Residential income above a 10% annual return.[15] Plaintiff argues that many mortgage REITs pay no incentive compensation or much lower incentive compensation than New Residential. The Complaint alleges that the original negotiation of the Management Agreement was a self-dealing transaction not conducted at arm's length.[16]

---

than the Company, from time to time, to the capital of any Subsidiary . . . , less (B) any capital dividends or capital distributions made by the Company to its stockholders or, without duplication, by any Subsidiary to its stockholders, partners or other equity holders. As used herein, the term 'Total Equity' shall mean (i) the equity transferred by Newcastle Investment Corp. on the Distribution Date, plus (ii) the total net proceeds to the Company from any common or preferred equity capital heretofore or hereafter raised by the Company or any Subsidiary of the Company . . . .").

[15] *Id.* § 8(e) (granting FIG a right to incentive compensation in "an amount equal to the product of (A) 25% of the dollar amount by which (1)(a) the Funds from Operations . . . of the Company, excluding Funds from Operations from Investments in . . . Consumer Loan Companies and any unrealized gains or losses from mark-to-market valuation changes on investments and debt . . . , per REIT Share . . . , plus (b) earnings (or losses) from [certain asset classes, including Consumer Loan Companies, calculated with special accounting treatment] . . . per REIT Share . . . , exceed (2) an amount equal to (a) the weighted average of the book value per REIT Share . . . multiplied by (b) a simple interest rate of ten percent (10%) per annum multiplied by (B) the weighted average number of REIT Shares outstanding during such period.").

[16] Compl. ¶¶ 40, 86.

### 2.    New Residential Stock Options Plan

The New Residential Stock Options Plan allows the New Residential board or a committee of the board to grant stock option awards.[17]  The plan states that the committee responsible for administering the plan may grant FIG—or its assignees under the Management Agreement—New Residential stock options as compensation for raising New Residential equity.  Section 5.5(a) of the plan states as follows:

> As consideration for the Manager's role in raising capital for the Company, the Manager may be awarded Stock Options in connection with any equity issuance by the Company, to acquire that number of shares of Stock up to ten percent (10%) of the equity securities issued by the Company in such equity issuance . . . .[18]

The committee also may grant FIG additional options outside the context of an equity issuance in its discretion.[19]  FOE I allegedly holds the options for New Residential stock that have been granted to FIG under the Stock Options Plan.[20]

---

[17]    Stock Options Plan § 3.1 ("The maximum number of shares of Stock reserved and available for issuance under the Plan shall be 30,000,000, as increased during the term of the Plan on the first day of each fiscal year beginning in and after calendar year 2014 by the number of shares of Stock equal to 10% of the number of shares of Stock newly issued by the Company during the immediately preceding fiscal year . . . .").

[18]    *Id.* § 5.5(a).

[19]    *Id.* § 5.5(f) ("The Committee may, from time to time, grant such Awards to the Manager as the Committee deems advisable in order to provide additional incentive to the Manager to enhance the value of the Company's Stock; <u>provided</u>, <u>however</u>, that no Award shall be awarded to the Manager (or its designee) in

9

### 3.    The Initial HLSS Merger

On February 22, 2015, New Residential entered into an Agreement and Plan of Merger (the "Initial Merger Agreement") to acquire all 71 million outstanding HLSS shares for $18.25 per share in cash, or a total of approximately $1.3 billion.[21]  The Initial Merger Agreement contained a representation that HLSS had made all required SEC filings as of the date of the closing, and New Residential retained the right to terminate the Initial Merger Agreement if HLSS breached that representation.  On March 17, 2015, HLSS filed a form 8-K stating that it could not file a form 10-K because it needed to prepare information related to its ability to operate as a going concern.  On March 18, 2015, NASDAQ notified HLSS that it was not compliant with the NASDAQ listing requirements due to HLSS's failure to file a form 10-K.  On March 23, 2015, HLSS received a subpoena from the SEC regarding communications with certain investment advisors and hedge funds.  In mid-March 2015, HLSS and New Residential began negotiating an alternative

---

connection with any equity issuance by the Company which provides for the acquisition of a number of equity securities in excess of ten percent (10%) of the maximum number of equity securities then being proposed to be issued by the Company.").

[20]    Compl. ¶ 42.

[21]    *Id.* ¶ 114; Agreement and Plan of Merger among Home Loan Servicing Solutions, Ltd., New Residential Investment Corp., and Hexagon Merger Sub, Ltd. § 2.01(c) (Feb. 22, 2015).

agreement, and on April 6, 2015, the two parties entered into a Termination Agreement releasing all claims under the Initial Merger Agreement, including New Residential stockholder claims (the "Termination Agreement").[22]

### 4. The HLSS Acquisition and Related Transactions

On April 6, 2015, New Residential agreed to purchase substantially all of the HLSS assets and assume all HLSS liabilities except a term loan, which was paid off, and approximately $50 million in post-closing liabilities. Under the asset purchase agreement, New Residential paid approximately $1.007 billion in cash and 28,286,980 shares of New Residential common stock as consideration. The total purchase price for the HLSS assets equaled approximately $1,441,200,000. The asset acquisition closed simultaneously with the signing of the asset purchase agreement. HLSS planned to sell the New Residential stock received as consideration in a public offering "as soon as practicable" after the asset purchase. HLSS would then merge into a New Residential subsidiary, and New Residential would pay an additional $50 million in cash to HLSS stockholders in the merger.[23]

In order to help fund the HLSS acquisition, New Residential conducted two public offerings in April and June of 2015. In an offering that closed on April 13,

---

[22]    Compl. ¶¶ 115-16.

[23]    *Id.* ¶¶ 117-21 (citing New Residential 10-Q for the Quarter Ended June 30, 2015 (Aug. 10, 2015)).

11

2015, HLSS sold the 28,286,980 New Residential shares it had received as consideration. New Residential sold an additional 29,213,020 shares to the public for $15.25 per share. In a June offering, New Residential sold $444 million worth shares at $15.88 per share. FOE I and certain FIG employees sold New Residential shares worth $56 million at the same time.[24]

The stock issued to fund the HLSS acquisition increased the New Residential paid-in equity capital account. As a result, the Stock Options Plan authorized New Residential to issue options awards to FOE I (presumably through FIG) in an amount equal to 10% of the shares New Residential issued. FIG also became entitled to a greater Management Fee equal to 1.5% of any new equity raised. FOE I received 2,828,698 options in connection with New Residential's stock issuance to HLSS as consideration for its assets, 2,921,302 options in connection with the April offering, and 2,793,593 options in connection with the June offering, totaling approximately 8.54 million options for New Residential stock. As to the Management Fee, the Complaint alleges that FIG's annual Management Fee increased from $19.7 million to $26.1 million, a $6.5 million

---

[24]     *Id.* ¶¶ 123-25 (citing New Residential Prospectus Supplement (April 10, 2015)). The Complaint alleges that the $15.25 price per share was below market because on April 6, 2015, New Residential stock traded between $15.29 per share and $15.43 per share. The stock price closed at $15.95 on April 10, 2015, and closed at $16.07 on April 13, 2015, the next trading day.

increase, as a direct result of the stock issued to HLSS in the asset purchase. The Complaint does not enumerate the increase in fees, if any, that resulted from the public offerings.[25]

Plaintiff alleges that certain New Residential actions made the HLSS acquisition even more favorable for Fortress. On April 8, 2015, New Residential recharacterized certain income from HLSS servicer advances from an increase in fair market value to interest income. The change increased New Residential's pro forma interest income from $524.2 million to $695.1 million. As a result of the recharacterization, FIG's incentive compensation increased from $34.5 million to $78.3 million.[26]

Plaintiff also alleges that after the HLSS acquisition, on May 7, 2015, New Residential and FIG renegotiated the Management Agreement and agreed to the Third Amended and Restated Management and Advisory Agreement (the "Renegotiated Agreement"). The Renegotiated Agreement retroactively changed the amortization of non-routine expenses in calculating FIG's incentive

---

[25] Compl. ¶¶ 123-24, 128, 131. The April options had a strike price of $15.25 per share, and the June options had a strike price of $15.88 per share.

[26] *Id.* ¶ 135.

compensation, which led to a $3.3 million increase in FIG's 2015 incentive compensation.[27]

### 5.    The HLSS Acquisition Aftermath

Plaintiff alleges that New Residential overpaid for HLSS given the highly risky state of the HLSS business and certain HLSS liabilities that New Residential assumed.  Several months before the HLSS acquisition on September 15, 2014, the SEC initiated an investigation into HLSS's restatement of its financial statements. HLSS agreed to a cease and desist order and a $1.5 million settlement payment. New Residential agreed to pay the $1.5 million payment in the HLSS acquisition. Then on September 29, 2015, Standard & Poor's Rating Services downgraded Ocwen's master service rating to Below Average.  The downgrade triggered a default under the indenture for $2.525 billion of notes issued by HLSS Servicer Advance Receivables Trust.  As a result, New Residential was required to repay in full the $2.525 billion of notes.[28]

### 6.    Limitations on Fiduciary Duties Owed to New Residential

Plaintiff alleges that article twelfth of the New Residential certificate of incorporation eliminates any fiduciary duties of Fortress affiliates, directors,

---

[27]    *Id.* ¶ 137-38.

[28]    *Id.* ¶¶ 139-41.  HLSS Servicer Advance Receivables Trust is allegedly owned by New Residential.  The Complaint does not specify whether it was acquired along with the other HLSS assets.

14

officers, or employees, including those who serve as directors of New Residential. Specifically, the article eliminates any duty that such Fortress parties may have to present corporate opportunities to New Residential or to refrain from competing with New Residential. It further provides that any transaction between New Residential and Fortress or its affiliates, "except as otherwise required by law," shall not be considered to breach any fiduciary duty that the Fortress affiliates may owe to New Residential.[29]

The Management Agreement purports to limit FIG, FOE I, and FIG employees' liability to New Residential.[30] "The Manager assumes no responsibility under this Agreement other than to render the services called for under this Agreement in good faith and shall not be responsible for any action of the Board of Directors in following or declining to follow any advice or recommendations of the Manager . . . ."[31] Additionally, "[t]he Manager, its members, managers, officers and employees will not be liable to the Company or

---

[29] *Id.* ¶ 78; Amended and Restated Certificate of Incorporation of New Residential Investment Corp., art. twelfth(c), (d), (e) (Apr. 29, 2013).

[30] Compl. ¶ 171; Management Agreement § 7(b) ("[T]he Manager, its directors, officers, stockholders and employees shall not be liable to the Company or any Subsidiary, the Board of Directors, or the Company's or any Subsidiary's stockholders or partners for any act or omission by the Manager, its directors, officers, stockholders or employees except as provided in Section 11 of this Agreement.").

[31] Management Agreement § 11(a).

15

any Subsidiary, to the Board of Directors, or the Company's or any Subsidiary's stockholders or partners for any acts or omissions by the Manager, its members, managers, officers or employees," except for "acts constituting bad faith, willful misconduct, gross negligence or reckless disregard of the Manager's duties under this Agreement."[32]

### C. Procedural History

Plaintiff filed its original complaint in this case on May 22, 2015 and the Amended Complaint on October 30, 2015. On December 11, 2015, Defendants filed a motion to dismiss the Amended Complaint. Plaintiff responded to the motion on February 23, 2016, and Defendants filed a reply brief on April 1, 2016. The parties presented oral argument on June 14, 2016. This opinion addresses Defendants' motion to dismiss.

## II. ANALYSIS

### A. Count I States a Derivative Claim

In Count I, Plaintiff alleges that Defendants breached their fiduciary duties by overpaying for the HLSS assets with stock and issuing options for New Residential shares to Defendant FOE I. Plaintiff argues that this states a direct claim because the equity value and voting power of Plaintiff's shares were reduced through the transactions. Defendants respond that any dilution Plaintiff suffered

---

[32] *Id.* § 11(a).

16

was the unavoidable accounting result of a transaction with a third party that allegedly injured New Residential, and thus, the claim must be derivative.

Stockholders of Delaware corporations can sue directly for injuries they have incurred in their individual capacities as stockholders. Stockholders of Delaware corporations also can sue derivatively on behalf of a corporation in which they own shares if the requirements of Court of Chancery Rule 23.1 have been satisfied. Because of the additional standing requirements in Rule 23.1 for derivative claims, plaintiffs and defendants often contest whether a claim is direct or derivative, and the court must make its own determination of the suit's classification.[33]

In *Tooley v. Donaldson, Lufkin, & Jenrette, Inc.*, the Delaware Supreme Court held that "the law to be applied henceforth in determining whether a stockholder's claim is derivative or direct" turns "solely on the following questions: (1) who suffered the alleged harm (the corporation or the suing

---

[33] *Tooley v. Donaldson, Lufkin, & Jenrette, Inc.*, 845 A.2d 1031, 1035 (Del. 2004) ("The Court of Chancery correctly noted that '[t]he Court will independently examine the nature of the wrong alleged and any potential relief to make its own determination of the suit's classification. . . . Plaintiffs' classification of the suit is not binding.'") (quoting *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 2003 WL 203060, at *3 (Del. Ch. Jan. 21, 2003)).

stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)."[34]

In *Gentile v. Rossette*, the Supreme Court held that "[i]n the typical corporate overpayment case, a claim against the corporation's fiduciaries for redress is regarded as exclusively derivative, irrespective of whether the currency or form of overpayment is cash or the corporation's stock."[35] Such claims normally are derivative "because any dilution in value of the corporation's stock is merely the unavoidable result (from an accounting standpoint) of the reduction in the value of the entire corporate entity . . . ."[36] But a corporate overpayment case may result in both a direct and a derivative claim when:

> (1) a stockholder having majority or effective control causes the corporation to issue 'excessive' shares of its stock in exchange for assets of the controlling stockholder that have a lesser value; and (2) the exchange causes an increase in the percentage of the outstanding shares owned by the controlling stockholder, and a corresponding decrease in the share percentage owned by the public (minority) shareholders."[37]

---

[34]    *Id.* at 1033.

[35]    906 A.2d 91, 99 (Del. 2006) (footnote omitted).

[36]    *Gentile*, 906 A.2d at 99.

[37]    *Id.* at 99-100.

18

Public stockholders need not be reduced from a control position to a minority position to have both direct and derivative claims.[38]

There is some tension in recent cases about how far to extend *Gentile*. In *Feldman v. Cutaia*, the Court of Chancery emphasized the limited reach of *Gentile*.[39] The Court in *Feldman* stated that for a transaction between a corporation and a third party to give rise to a direct claim, the corporation must have a controlling stockholder that used its controlling position to orchestrate the transaction.[40] The Court believed that limiting the reach of *Gentile* was necessary

---

[38] *Id.* at 101; *see also In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 766, 774–75 (Del. 2006) (quoting *In re Paxon Commc'n Corp. S'holder Litig.*, 2001 WL 812028, at *5 (Del. Ch. July 12, 2001) ("[D]ilution claims are individual in nature only where a significant stockholder's interest is increased at the sole expense of the minority" and not "'where the entity benefiting from the allegedly diluting transaction . . . is a third party rather than an existing significant or controlling stockholder.'").

[39] *Feldman v. Cutaia*, 956 A.2d 644, 657 (Del. Ch. 2007) ("*Gentile* and *Gatz* are predicated on the idea that transactions of this type result in an improper transfer of both economic value and voting power from the minority to the controlling stockholder. Thus, it is clear from those decisions that the Delaware Supreme Court intended to confine the scope of its rulings to only those situations where a controlling stockholder exists. Indeed, any other interpretation would swallow the general rule that equity dilution claims are solely derivative, and would cast great doubt on the continuing vitality of the *Tooley* framework.").

[40] *Id.* Plaintiff alleges that Fortress is a controlling stockholder of New Residential. Fortress, together with its affiliates and principals, owned 7.4% of New Residential before the challenged transactions on a fully diluted basis, and Fortress is exempt from New Residential's 9.8% limitation on stock ownership. Fortress allegedly chose the directors on New Residential's initial board and controls the nominating committee. New Residential also has a staggered board, and stockholders are not permitted to call a special meeting or act by written consent.

19

to avoid "swallow[ing] the general rule that equity dilution claims are solely derivative."[41] The Supreme Court affirmed and stated that "[i]n the absence of a controlling stockholder, 'such equal "injury" to the [company's] shares resulting from a corporate overpayment is not viewed as, or equated with, harm to specific shareholders individually.'"[42]

Conversely, in *Carsanaro v. Bloodhound Technologies, Inc.*, the Court of Chancery held that dilution of economic value through new stock issuances to venture capitalists gave rise to a direct claim, even without a controlling stockholder, because the board was not independent from the venture capitalists.[43] The opinion held that:

> the Delaware Supreme Court's decisions preserve stockholder standing to pursue individual challenges to self-interested stock issuances when the facts alleged support an actionable claim for breach of the duty of loyalty. Standing will exist if a controlling stockholder stood on both sides of the transaction. Standing will also

---

Compl. ¶¶ 50-76. I have serious doubts that Fortress exercises control over New Residential in light of *In re KKR Fin. Hldgs. LLC S'holder Litig.*, 101 A.3d 980 (Del. Ch. 2014). I need not decide that issue, however, because I agree with *In re El Paso Pipeline P'rs, L.P. Deriv. Litig.*, 132 A.3d 67 (Del. Ch. 2015) that these claims are subject to Rule 23.1.

[41] *Feldman*, 956 A.2d at 657.

[42] *Feldman v. Cutaia*, 951 A.2d 727, 732 (Del. 2008) (quoting *Gentile*, 906 A.2d at 99).

[43] 65 A.3d 618, 658–59 (Del. Ch. 2013).

exist if the board that effectuated the transaction lacked a disinterested and independent majority.[44]

The Court recognized that prohibiting direct stockholder claims would be inequitable when strong derivative claims would be extinguished by a merger.[45]

The Court of Chancery in *In re El Paso Pipeline Partners, L.P. Derivative Litigation* reiterated a broader view of dual-natured claims but explained that different considerations apply when this question arises in the context of a Rule 23.1 motion to dismiss versus a determination of whether investors can continue to pursue claims after a merger. The Court specifically stated as follows:

> In my view, Delaware law can and should treat a dual-natured claim as derivative for purposes of Rule 23.1 and the doctrine of demand, but as direct for purposes of determining whether sell-side investors can continue to pursue the claim after a merger. Treating a dual-natured claim as derivative for purposes of claim initiation achieves the important goals of screening out weak claims and providing an efficient and centralized mechanism for conducting the litigation. Treating a dual-natured claim as direct for purposes of claim continuation preserves the ability of investors to pursue legitimate claims, promotes accountability, and provides a superior mechanism for doing so than secondary litigation challenging the transaction that eliminated the plaintiff's standing to sue derivatively.[46]

---

[44]     *Carsanaro*, 65 A.3d at 658.

[45]     *Id.*

[46]     132 A.3d 67, 75, 105 (Del. Ch. 2015).

21

Even assuming that the claims here are dual-natured, as Plaintiff argues, I find that conducting a Rule 23.1 demand analysis for claims that a corporation overpaid for a third-party's assets with stock best harmonizes the case law. Therefore, I review the breach of fiduciary duty claim under a Rule 23.1 demand analysis.

## B. Plaintiff Has Not Sufficiently Pled Demand Futility

Plaintiff did not demand that the board of New Residential bring this derivative suit. Thus, Plaintiff must plead particularized facts showing that demand is excused as futile to avoid dismissal under Rule 23.1.[47]

### 1. Rule 23.1 Standard of Review

A stockholder seeking to pursue a derivative claim in this Court must meet the burden imposed by the demand requirement. The demand requirement is embodied in Delaware Court of Chancery Rule 23.1, which provides that "[t]he complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort."[48] A stockholder plaintiff may satisfy the demand requirement by either making demand on the board to undertake corrective action or demonstrating that any such demand would have been futile and, therefore, that

---

[47] Ct. Ch. R. 23.1.

[48] *Id.*

22

demand is excused. Where the plaintiff fails to comply with the demand requirement and fails to plead with particularity why a demand would be futile, the complaint will be dismissed.[49]

The Supreme Court in *Aronson v. Lewis* articulated a two-part test to show demand futility.[50] The court must decide whether, given the particularized facts alleged, a "reasonable doubt is created that: (1) the directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment."[51]

In order to be disinterested, a director "can neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally."[52] Independence means that "a director's decision is based on the merits of the subject before the board rather than extraneous considerations or influences."[53] In order to show lack of independence, the plaintiff must

---

[49]     *See Haber v. Bell*, 465 A.2d 353, 357, 360 (Del. Ch. 1983).

[50]     473 A.2d 805, 814 (Del. 1984).

[51]     *Aronson*, 473 A.2d at 814.

[52]     *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 808, 821 (Del. Ch. 2005) (quoting *Aronson*, 473 A.2d at 812) (internal quotation marks omitted).

[53]     *Id.* (quoting *Aronson*, 473 A.2d at 816) (internal quotation marks omitted).

23

adequately allege that a director is "so 'beholden' to an interested director . . . that his or her 'discretion would be sterilized.'"[54] This requires a showing of "financial ties, familial affinity, a particularly close or intimate personal or business affinity or . . . evidence that in the past the relationship caused the director to act non-independently vis-à-vis an interested director."[55]

The court will examine all facts pled to determine whether, when taken together, they cast a reasonable doubt on the director's disinterest or independence.[56] When a director of a corporation owes fiduciary duties as a director or officer of another corporation, the director is conflicted for purposes of the first prong of *Aronson* in a transaction between the two corporations "[w]hether phrased as an interest issue (per § 144) or an independence issue (because of [the director's] duties to an interested party) . . . ."[57] "A board that is evenly divided

---

[54] *Beam v. Stewart*, 845 A.2d 1040, 1050 (Del. 2004) (quoting *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993)).

[55] *Beam*, 845 A.2d at 1051.

[56] *Cal. Pub. Empl. Ret. Sys. v. Coulter,* 2002 WL 31888343, at *9 (Del. Ch. Dec. 18, 2002) ("If taken separately, none of the individual allegations would be adequate to raise a reasonable doubt as to Mandigo's disinterest or independence. . . . Taken together, they give this Court reason to doubt that Mandigo is disinterested and independent."), *cited in Del. Cty. Empl. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1022 n.20 (Del. 2015).

[57] *Parfi Holdings AB v. Mirror Image Internet*, 794 A.2d 1211, 1231 (Del. Ch. 2001), *rev'd on other grounds*, 817 A.2d 149 (Del. 2002).

between conflicted and non-conflicted members is not considered independent and disinterested."[58]

Demonstrating demand futility under the second *Aronson* prong—that the challenged transaction was not the exercise of valid business judgment— requires a showing that the situation is one of the "rare cases [in which] a transaction may be so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability exists."[59] The second *Aronson* prong applies when the particularized facts are such that it is "difficult to conceive" that a director could have satisfied his or her fiduciary duties.[60]

### 2. At Least Half of the New Residential Directors are Beholden to Fortress

To determine whether Plaintiff has alleged particularized facts giving rise to an inference that the majority of the board lacks independence from Fortress, I must analyze whether each New Residential director is independent.[61]

---

[58]     *Gentile v. Rossette*, 2010 WL 2171613, at *7 (Del. Ch. May 28, 2010).

[59]     *See Aronson v. Lewis*, 473 A.2d 805, 815 (Del. 1984).

[60]     *See Ryan v. Gifford*, 918 A.2d 341, 355 (Del. Ch. 2007).

[61]     *See Sanchez*, 124 A.3d at 1020. I do not review the individual directors for disinterestedness because Plaintiff alleges personal interests of only one director, Edens. All other allegations of interest relate to the individual directors' relationships with the Fortress entities.

Edens is a founder, principal, and co-chairman of Fortress. He owns 23.2% of the Fortress Class A shares and 27.9% of the Fortress Class B shares. He is a director of FIG and FIG Corp., and he earned approximately $47.5 million in compensation and distributions from Fortress funds during 2014. Edens is also a beneficial owner of FOE I.

Jacobs is a director of Fortress, New Residential, and Springleaf as well as two other companies not identified in the Complaint. Plaintiff alleges that Jacobs has received $450,000 from his Fortress, New Residential, and Springleaf directorships in 2014.

Nierenberg is a director of New Residential and a Managing Director at Fortress.[62] He is the New Residential CEO, a FIG employee, and he received tandem awards of options for New Residential stock through that position.

Edens and Jacobs serve on both the Fortress board and the New Residential board, and Nierenberg is a Fortress officer and a director of New Residential; thus, they owe fiduciary duties to both companies and are considered conflicted in board decisions regarding dealings between New Residential and Fortress.[63] To the

---

[62] *Kahn v. Portnoy*, 2008 WL 5197164, at *12 (Del. Ch. Dec. 11, 2008) ("As a director of TA and an officer of RMR, O'Brien owes fiduciary duties to both TA and RMR.").

[63] *See Parfi Holdings AB v. Mirror Image Internet*, 794 A.2d 1211, 1230-31 (Del. Ch. 2001), *rev'd on other grounds*, 817 A.2d 149 (Del. 2002).

extent Fortress is materially interested in the side benefits it might receive from the HLSS transactions, Plaintiff has alleged particularized facts sufficient to create a reasonable doubt as to Edens, Jacobs, and Nierenberg's disinterestedness in the HLSS transactions because of their dual fiduciary positions at Fortress and New Residential.[64]

### 3. Plaintiff Does Not Allege Sufficient Facts to Excuse Demand

All of the director defendants' alleged conflicts are based on their relationships with Fortress; therefore, Plaintiff must adequately allege that Fortress is materially interested in the challenged transactions.[65]

Plaintiff argues that Fortress is interested because "Fortress has already received 8,543,538 options, $6.5 million in increased management fees, $43.8 million in increased incentive fees from recharacterization of HLSS income, $57 million in stock sale proceeds and $3.3 million in increased compensation from the

---

[64] *See Portnoy*, 2008 WL 5197164, at *11–12; *see also Gentile v. Rossette*, 2010 WL 2171613, at *7 (Del. Ch. May 28, 2010) ("A board that is evenly divided between conflicted and non-conflicted members is not considered independent and disinterested."). Because I hold that Plaintiff casts a reasonable doubt on at least half of the New Residential directors' disinterestedness and independence, I do not analyze the remaining directors.

[65] *In re Walt Disney Co. Deriv. Litig.*, 731 A.2d 342, 357 (Del. Ch. 1998) ("Since, as a matter of law, Plaintiffs are unable to show a reasonable doubt as to Eisner's absence of self-interest, his potential domination over these two directors is inconsequential.").

Management Agreement amendment relating to the transaction expenses."[66] The Complaint actually alleges that FOE I received the options, FIG received the increased Management Fee and incentive compensation, and FIG, FOE I, and FIG employees received the proceeds from the stock sales. The Complaint cites Fortress's form 10-K for the year December 31, 2014, which refers to New Residential as a "permanent capital vehicle" and states the following regarding Fortress's interest in its permanent capital vehicles:

> Pursuant to our management agreements, we earn management fees from each publicly traded permanent capital vehicle equal to 0.75% - 1.50% of the company's contributed capital or book equity (as defined in such agreements). In addition, we generally earn incentive income equal to 25% of operating results in excess of specified returns to the shareholders. In addition to these fees, we also receive, for services provided, options in connection with each of their common stock offerings.[67]

---

[66] Pl.'s Answering Br. 35. Plaintiff also alleges that New Residential pursued the HLSS acquisition to facilitate Nationstar's acquisition of MSRs from Ocwen. That allegation, however, is conclusory and does not meet the Rule 23.1 standard for demand futility. The only facts alleged are that the two acquisitions were close in time and that New Residential agreed to retain Ocwen as a mortgage servicer for two years following the HLSS acquisition. Comp. ¶ 112. Those are not particularlized facts giving rise to the inference that Fortress had a *quid pro quo* arrangement with Ocwen to retain it as the servicer for the HLSS assets.

[67] Fortress Investment Group LLC 2014 10-K, at 5 (Feb. 25, 2016), *cited in* Compl. ¶ 57. "We" and "our" in the Fortress form 10-K "refer, collectively, to Fortress Investment Group LLC and its subsidiaries, including the Fortress Operating Group (as defined below) and all of its subsidiaries, excluding consolidated variable interest entities, unless the context requires otherwise." Fortress Operating Group "refers to the limited partnerships and their subsidiaries through

Defendants do not contest that Fortress controls FOE I and FIG, but they argue that Plaintiff does not adequately allege that Fortress is interested because the Complaint does not allege that FIG Corp. receives any economic returns from FOE I as its general partner.[68] I need not resolve this dispute because even assuming that Fortress is interested and received the benefits described above, Plaintiff fails to plead facts showing that Fortress's interest is material.

Fortress's interest in the challenged transactions must be material in order to show that the board had a disabling conflict that excuses demand in this case.[69]

---

which we conduct our business and hold our investments. The public company controls the Fortress Operating Group through wholly owned subsidiaries that serve as the general partner of each FOG entity."

[68] Defs.' Opening Br. 31-32.

[69] *Khanna v. McMinn*, 2006 WL 1388744, at *17 (Del. Ch. May 9, 2006) ("Ultimately, the inquiry into independence turns in this instance on whether Covad's business relationship with BEA Systems was material to BEA or to [the director] himself as a director of BEA."); *see also Jacobs v. Yang*, 2004 WL 1728521, at *6 (Del. Ch. Aug. 2, 2004) ("Merely stating that the agreements between Yahoo! and AMG are 'crucial to AMG's continued viability' is not enough. . . . [T]he facts alleged do not give rise to the inference that the value of these contracts was material to Activision or Macromedia."). This is not a case of self-dealing where the materiality requirement does not apply. *Cf. Cambridge Ret. Sys. v. Bosnjak,* 2014 WL 2930869, at *5 (Del. Ch. June 26, 2014) ("[T]he need to demonstrate materiality to establish the interest of a director in a transaction applies only 'in the absence of self-dealing' and that 'whenever a director stands on both sides of the challenged transaction he is deemed interested and allegations of materiality have not been required.'" (quoting *Orman v. Cullman*, 794 A.2d 5, 23, 25 n.50 (Del. Ch. 2002)). Rather, the HLSS acquisition was a third-party transaction between New Residential and HLSS in which Fortress allegedly received a special side benefit. *See id.* ("[A] 'plaintiff's burden of proof of a director's self-interest in an arms-length third-party transaction should be greater

Plaintiff has not alleged that the options FOE I received and the fees FIG received were material to Fortress. For example, the Complaint does not allege anything regarding the percentage of Fortress's ownership of FOE I, through FIG Corp., or the ratio of the alleged benefits to any Fortress financial metric. Even if these specific benefits are not material to Fortress, Plaintiff has not alleged that the challenged business practices (or these types of transactions) are material to Fortress taken together. Allegations that some of the effects of the challenged transactions benefited Fortress alone are not enough. Plaintiff must allege that the benefits were material to Fortress to excuse demand under the first prong of *Aronson*. Without allegations of the materiality of the fees and options, Plaintiff has not cast a reasonable doubt on Edens, Nierenberg, or Jacobs's independence in the challenged transactions.

The Complaint also does not allege one of the "rare cases [in which] a transaction may be so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability exists."[70] Plaintiff does not allege that the New Residential directors were uninformed or

_____

than in a classic self-dealing transaction where a director or directors stand on both sides of a transaction.'" (quoting *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 362-63 (Del. 1993))).

[70]     *See Aronson v. Lewis*, 473 A.2d 805, 815 (Del. 1984).

30

acted blatantly without regard to New Residential's interests. Demand thus is not excused for Plaintiff's claims.

Plaintiff also fails to adequately allege how the New Residential directors were incentivized to overpay for HLSS. Plaintiff argues that the increased Management Fee and options rendered Fortress interested. The incentive compensation under the Management Agreement, however, appears to limit any incentive to overpay because FIG's incentive compensation depends on the percent return New Residential can earn on the book value of equity. Plaintiff should allege the amount by which New Residential allegedly overpaid, and Plaintiff's allegations should deal with the overpayment incentives so the Court can analyze the effects of the challenged transactions in the aggregate.

Because Plaintiff pleads potentially viable claims, I dismiss Counts I and II with leave to replead.[71] In light of that dismissal, I decline to resolve Defendants' Rule 12(b)(6) motion to dismiss Counts I and II.

## C. Count III's "As Applied" Challenges Are Unripe

In Count III Plaintiff seeks a declaratory judgment that: (1) the New Residential certificate of incorporation article twelfth does not limit the fiduciary duties of the Defendants with respect to any conduct challenged in Counts I and II;

---

[71] Ct. Ch. R. 15(aaa).

(2) the Management Agreement sections 7(b) and 11(a) do not limit Defendants' liability with respect to the same conduct; and (3) the Termination Agreement did not release the claims of New Residential stockholders against HLSS.[72]

Defendants argue that these claims for declaratory judgment are not ripe because Defendants have not raised these provisions as defenses.[73]

### 1. Standard of Review

The Delaware courts can hear declaratory judgment actions under 10 *Del. C.* § 6501 provided that an "actual controversy" exists.[74] The following four criteria must be satisfied for an "actual controversy" to exist:

> (1) It must be a controversy involving the rights or other legal relations of the party seeking declaratory relief; (2) it must be a controversy in which the claim of right or other legal interest is asserted against one who has an interest in contesting the claim; (3) the controversy must be between parties whose interests are real and adverse; (4) the issue involved in the controversy must be ripe for judicial determination.[75]

To determine whether a controversy is ripe, the court must balance the benefits to be derived from issuing a declaratory judgment against the desire to avoid advisory

---

[72]     Compl. ¶ 170.

[73]     Defs.' Opening Br. 53.

[74]     *Stroud v. Milliken Enters., Inc.*, 552 A.2d 476, 479 (Del. 1989).

[75]     *Id.* at 479-80.

32

opinions.[76]  The Supreme Court recently stated that "a dispute will be deemed ripe if 'litigation sooner or later appears to be unavoidable and where the material facts are static.'"[77]  Additionally, this Court has held that stockholder challenges to the statutory validity of charter or bylaw provisions of a Delaware corporation will be considered ripe.[78]  But as applied challenges cannot be brought until the bylaw or certificate provision is applied improperly.[79]

## 2. The Termination Agreement

Plaintiff's claim as to the Termination Agreement is not ripe because Counts I and II are dismissed without prejudice.  I will not decide now whether Defendants may, at a later point in this case, have a valid defense.  To construe this contract when its provisions are not implicated by the litigation in this Court would be to

---

[76]  *In re Allergan, Inc. S'holder Litig.*, 2014 WL 5791350, at *6 (Del. Ch. Nov. 7, 2014).

[77]  *XI Specialty Ins. Co. v. WMI Liquidating Trust*, 93 A.3d 1208, 1217 (Del. 2014) (quoting *Julian v. Julian*, 2009 WL 2937121, at *3 (Del. Ch. Sept. 9, 2009)).

[78]  *See Boilermakers Local 154 Ret. Fund v. Chevron Corp.*, 73 A.3d 934, 947 (Del. Ch. 2013) ("Facial challenges to the legality of provisions in corporate instruments are regularly resolved by this Court."  (quoting *Lions Gate Entm't Corp. v. Image Entm't Inc.*, 2006 WL 1668051, at *6 (Del. Ch. June 5, 2006)) (internal quotation marks omitted)).

[79]  *Allergan*, 2014 WL 5791350, at *7 ("Count I . . . does not challenge the facial validity of any provision of Allergan's Certificate or Bylaws.  Plaintiffs . . . advance what is essentially a claim of contractual construction concerning the meaning of the Similar Item provision as it might apply in a hypothetical situation. . . . [T]his is a classic example of a request for an advisory opinion that is not ripe, and many never become ripe, for judicial review.").

render an advisory opinion.[80] Therefore, Count III is dismissed without prejudice as to the Termination Agreement.

### 3. The New Residential Certificate of Incorporation

Taking all inferences in Plaintiff's favor, it appears that Plaintiff has pled both a facial challenge to the statutory validity of article twelfth and an as applied challenge to the application of article twelfth in the context of the HLSS transactions. The statutory validity claim is ripe for judicial review,[81] but the as applied challenge is not ripe because Defendants have not invoked article twelfth in this case, and they may never invoke it.[82] Defendants' motion to dismiss the statutory validity claim is denied, but the motion to dismiss Plaintiff's as applied claim is granted without prejudice.

### 4. New Residential's Management Agreement

There does not exist a ripe controversy over the validity of the contractual limitation on FIG's liability under the Management Agreement because Counts I

---

[80]   *See KLM Royal Dutch Airlines v. Checchi*, 698 A.2d 380, 382 (Del. Ch. 1997) ("Advisory opinions ill-serve the judicial branch and the public by expending resources to decide issues that may never come to pass. More importantly, the judiciary's role in the lawmaking process is an interstitial one, carried out by the application of legislative enactments and common law principles to concrete factual circumstances that have created real and present controversies. An action seeking declaratory relief is not exempt from these requirements and must present the court with an actual controversy that is ripe for judicial decision.").

[81]   *See Chevron*, 73 A.3d at 945.

[82]   *See Allergan*, 2014 WL 5791350, at *7.

34

and II are dismissed without prejudice. Further, this Court will not opine on potential defenses that Defendants might raise if Plaintiff decides to replead. Defendants' motion to dismiss Count III as to the Management Agreement is granted without prejudice.

## III. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss Count I as an improperly pled derivative claim is GRANTED with leave to replead. Defendants' motion to dismiss Count II for failure to comply with Rule 23.1 is GRANTED with leave to replead. Defendants' motion to dismiss Count III as unripe is GRANTED as to the Termination Agreement, the Management Agreement, and the as applied challenge to the New Residential certificate of incorporation, with leave to replead. The motion is DENIED as to the facial validity challenge to the certificate of incorporation.

**IT IS SO ORDERED**.